UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- X
                         :

PROFESSOR CHUKWUMEZIRI N. EZUMA,    :
                         :
           Plaintiff,           :
                         :
      -against-             :

CITY UNIVERSITY OF NEW YORK, et al.,    :
                         :
           Defendants.       :
                         :
                         :
------------------------------------------------------- X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 2 7 2009 ★

BROOKLYN OFFICE

**MEMORANDUM
DECISION AND ORDER**

07 Civ. 3561 (BMC)

**COGAN**, District Judge.

      Plaintiff is a professor at Medgar Evers College ("MEC"), a four-year college within the City University of New York ("CUNY"). He alleges that he was illegally retaliated against, in violation of his rights under Title VII, the First Amendment, and corresponding state and local law, for supporting the complaint of his subordinate and colleague, Prof. Evelyn Maggio, that she was sexually harassed by another faculty member, Dr. Emmanuel Egbe, and for successfully challenging the credentials of another faculty member, Veronica Udeogalanya. The case is before me on defendants' motion for summary judgment. The motion is granted.

## BACKGROUND

      The facts, viewed in the light most favorable to plaintiff, are derived from the parties' submissions and their Local Rule 56.1 statements.

      Plaintiff presently is a tenured Professor in the Department of Economics and Finance at MEC. Prior to this position, from 1993-2006, he was a faculty member in the Department of Accounting, Economics, and Finance ("DAEF"), the predecessor to the Department of



Economics and Finance, at MEC. He had served as Chair of that department from 1995-2004. Both of these departments are or were within the School of Business at MEC.

During his tenure as Chair, in late 2001, Prof. Evelyn Maggio, a faculty member within his department, complained to him that another faculty member, Dr. Emmanuel Egbe, was sexually harassing her. Plaintiff brought her complaint to the attention of the Provost, Dominic Nwasike, both orally and ultimately in a memorandum that he sent on March 8, 2002.

At the end of 2004, plaintiff was approached by a lawyer from CUNY's Central Office, who was handling CUNY's internal investigation of Maggio's complaint, and a New York City Police Detective, who was investigating a criminal complaint that Maggio had filed against Egbe. He told both of them what Maggio had told him.

On September 6, 2005, Maggio sued CUNY and Egbe in a case in this Court, which was ultimately settled. Plaintiff was interviewed by an Assistant Attorney General, who was defending CUNY in Maggio's lawsuit, in connection with that case. Again, he related what Maggio had told him.

Plaintiff contends that as a result of his support for Maggio, including his rejection of requests from Egbe and his allies that he demote her or derail her tenure application, he was subjected to a number of retaliatory actions between 2002 and May 26, 2006. These consisted of removing him from his position as Chair of DAEF, rejecting the vote of department members that he continue as Chair and appointing Egbe in his stead, failing to pay him for work he would have done as Chair of the Department, attempting to transfer plaintiff out of the School of Business, removing plaintiff from various academic committees, and changing his teaching schedule.

However, plaintiff failed to file his administrative charge with the EEOC until March 22, 2007. This Court has previously held that, to the extent plaintiff has stated these claims under Title VII as opposed to state and local anti-discrimination laws (which also are alleged), his claim that these actions were retaliatory is time-barred under 42 U.S.C. §2000e-5(e)(1) (EEOC charge must be filed within 300 days of the alleged unlawful act to maintain Title VII claim).

The surviving claims fall into three categories. The first category consists of several alleged instances of retaliation that occurred in the Fall of 2006. These are not time-barred under Title VII because they occurred within 300 days of the filing of plaintiff's administrative claim. The second category of surviving claims consists of alleged retaliatory acts that occurred subsequent to March 22, 2004 under N.Y. Exec. Law § 296 ("NYSHRL"), and New York City Admin. Code § 8-107 et seq. ("NYCHRL"). Those statutes "each have three-year statute of limitations periods . . . [, which are] tolled during the period in which a complaint is filed with the EEOC." Siddiqi v. New York City Health & Hospitals Corp., 572 F. Supp. 2d 353, 373 (S.D.N.Y. 2008) (citations omitted).[1] Here, plaintiff filed his administrative claim on March 22, 2007. The third category of surviving claims consists of a retaliatory hostile work environment claim, which is the sum total of all the retaliatory acts he has asserted.

The Title VII claims arising from the alleged retaliatory acts in the Fall, 2006 term arose as follows. MEC had created a new Department of Economics and Finance (effectively realigning the accounting department). This department included four faculty members: plaintiff, Egbe, Veronica Udeogalanya, and Prof. Kiho Kim. Plaintiff believed that as the most experienced faculty members, he or Dr. Kim were the most likely candidates for Chair or Acting

---

[1] That portion of the Court's May 7, 2008 Order finding that the removal of plaintiff as Chair in the Spring/Summer of 2004 was time barred under state and local law is hereby vacated. However, as set forth below, this does not affect the outcome of this case as there is no genuine issue that Jackson did not learn of the Maggio incident, let alone plaintiff's support for Maggio, until the Fall of 2004.

3

Chair; he considered Egbe effectively ineligible because of the controversy surrounding Maggio. Nevertheless, President Jackson appointed Udeogalanya as Acting Chair.

Plaintiff investigated Udeogalanya's credentials and found that she had obtained her doctorate through a distance learning program that lacked the kind of accreditation that CUNY required for departmental Chairs. Plaintiff brought his findings to the attention of MEC and CUNY administrations. Udeogalanya was then removed as Acting Chair. No replacement has been chosen.

While this was going on, on November 1, 2006, the President of MEC, Edison Jackson, received an email from Diana Richardson, a student in one of plaintiff's classes, complaining about plaintiff's teaching ability and classroom technique. The email accused plaintiff of "refus[ing] to work with the majority of students;" recycling a test that he or someone else had used at PACE University (it said PACE University on the top), which she felt made it easy to cheat; testing on material that had never been taught; and using his own authored textbook which was "confusing." The email concluded by stating, "we are suffering. I am on the Deans List and I have no intention of coming off due to awful teachings [sic]. Professor Ezuma is totally unfit to teach here at Medgar Evers College. I hereby request of you to investigate this matter immediately."

President Jackson responded to the email, thanking Ms. Richardson for "sharing this disturbing experience" and assuring her, "[w]e are investigating this situation as I write this email." He also asked the Provost, Nan-Fisher Williams, to share the complaint with plaintiff and get his response, which she did without identifying the student. Plaintiff responded by disputing the criticism and defending his classroom conduct, on a point by point basis, although

4

the response may not have been carefully prepared. For example, as to testing on material not covered in the course, he wrote the President:

> [W]hen I went through the exam, with students realized that the materials were all covered [sic]. Infact [sic], I indicated the pages the questions were taken [sic]. In fact, the same concepts were repeated in different sections to find out whether students' [sic] could recognize the concpts [sic].This wmemo [sic] do not appear to be me since this class seems to relate to me positively and so also all myas [sic] addressed.

Upon receiving this response, President Jackson directed plaintiff not to meet with his class on November 6, 2006. Instead, he sent the Dean of the School of Business, Joan Parrott-Fonseca, and the acting Chair of the Department to take over the class, in contravention of established procedure for investigating student complaints. Dean Williams accompanied them. A number of the students expressed concerns about plaintiff's teaching and were unable to answer questions that Udeogalanya proposed to them on the subject matter of the course.[2] Udeogalanya advised the class that she would be taking over the class pending the investigation. She taught two sections of plaintiff's classes for about a month.

Dean Williams reported back to President Jackson that other students shared the concerns expressed in the Diana Richardson email. Jackson attended a meeting with representatives of the faculty union and the faculty senate and discussed plaintiff's classroom performance. They proposed that instead of removing plaintiff from his classes, the college should create alternative sections of the course to be held at the same time, and students would have the option of staying in plaintiff's sections or transferring to the new sections.[3] Jackson directed Fonseca and

---

[2] Plaintiff asserts that Udeogalanya's recollection of what transpired in front of the class is inconsistent with that of Williams and Fonseca. I see no inconsistency; at most, Udeogalanya's recollection is less detailed. Plaintiff focuses on Udeogalanya's testimony that none of the three of them ever interviewed each student, but neither Williams nor Fonseca testified that they did.

[3] Although plaintiff, in his brief, attempts to argue that such a meeting never occurred, at oral argument plaintiff's counsel confirmed that he was not contesting the occurrence of this meeting.

5

Udeogalanya to implement this suggestion and they did; all of the students in plaintiff's sections transferred to the new sections. By the next semester, the situation had apparently normalized. Plaintiff does not contend that the alternative class section had any effect on his class attendance in the ensuing semesters.

During the same period (Fall, 2006), Dean Williams instructed the bookstore not to carry plaintiff's co-authored and self-published textbook. Plaintiff was, however, permitted to use his textbook for the classes he taught that did not have multiple sections.

## DISCUSSION

### I

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986); see also Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 586-88 (emphasis removed).

District courts are cautious about granting summary judgment when intent is at issue since "a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991). However, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

I evaluate a Title VII retaliation claim under the same three-step, burden-shifting framework used for an adverse employment claim, as established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, a plaintiff must establish a prima facie case of retaliation by demonstrating that [1] "he engaged in protected participation or opposition under Title VII . . . , [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199, 205-06 (2d Cir. 2006) (citations omitted). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action and if he carries that burden, it shifts back to plaintiff to demonstrate by competent

evidence that the reasons proffered by defendant were pretext for retaliatory animus based upon the protected Title VII activity. See Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006).

## II

Defendants first contend that because they have an anti-discrimination policy requiring Department Chairs, of which plaintiff was one, to report instances of sexual harassment which come to their attention, plaintiff's actions that are alleged to have resulted in retaliation do not constitute "protected activity." The school anti-harassment policy provides that

> [e]ach . . . department chairperson . . . or other person with supervisory responsibility . . . is responsible within his or her area of jurisdiction for the implementation of this Policy and must report to the Panel Coordinator any complaint of sexual harassment made to him or her and other incidents of sexual harassment of which he or she becomes aware or reasonably believes to exist.

Defendants rely on §704 of Title VII, which prohibits retaliation against an employee "because he has opposed any practice made unlawful" under Title VII. 42 U.S.C. §2000e-3(a). Under this "opposition clause," defendants argue that, because of the anti-discrimination policy, plaintiff did not "oppose" the alleged discrimination, but rather merely reported it pursuant to his official responsibilities. Therefore, according to defendants, plaintiff was carrying out school policy, not contesting it. Defendants attribute the same motivation behind plaintiff's statements to the New York Attorney General; the police detective investigating criminal charges that Maggio filed against Egbe; and statements to the CUNY Central Office. They cite cases such as Correa v. Mana Products, Inc., 550 F. Supp. 2d 319, 330-31 (E.D.N.Y. 2008), which hold, in the context of human resources managers, that to engage in protected activity,

> the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist

8

other employees in asserting [Title VII] rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights . . . .

(Quoting McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486-87 (10th Cir. 1996)).

The Supreme Court's recent decision in Crawford v. Metropolitan Gov't of Nashville and Davidson County, ___ U.S. ___, 129 S.Ct. 846 (2009), decided after this case was *sub judice*, impacts this argument. In Crawford, the employee took no action against a harassing director, but when questioned by her employer concerning an investigation of the director, she described the director's conduct towards her, which involved repeated over-the-top physical gestures like pulling the employee's head towards his crotch. She was then terminated, and sued for retaliation. The Supreme Court rejected the argument that "opposition" must entail "active" as opposed to "passive" conduct. It held that even though the employer had initiated the conversation, retaliation resulting from the employee's response could still be actionable. The Court described the employee's response

> as an ostensibly disapproving account of sexually obnoxious behavior toward her by a fellow employee, an answer she says antagonized her employer to the point of sacking her on a false pretense. Crawford's description of the louche goings-on would certainly qualify in the minds of reasonable jurors as "resist[ant]" or "antagoni[stic]" to [the director's] treatment, if for no other reason than the point argued by the Government and explained by an EEOC guideline: "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication" virtually always "constitutes the employee's opposition to the activity."

129 S.Ct. at 850-51 (citations omitted).

However, Crawford does not dispose of defendants' argument here. There is a distinction between an employee's reporting of egregious conduct directed at her, as in Crawford, and an employee's reporting of egregious conduct directed at another, as in the present case. The Supreme Court in Crawford viewed the employee's description of the conduct directed at her as so patently offensive that its reporting was inherently oppositional – her

description of the conduct "would certainly qualify in the minds of reasonable jurors as "resist[ant]" or "antagoni[stic]" to the way she was treated. Id. In contrast, a supervisor or human relations manager charged with reporting complaints about alleged misconduct might himself consider those allegations not credible, and might so inform the company in making his report. (That was the case in Correa, for example, where the human resources manager, while passing on the report, also gave her opinion that the complainant should not be believed. It is hard to view such an action as "opposition" to the employer.) And even without expressing an opinion as to the credibility of the complainant's statements, the mere passing on of such statements by a supervisor or human resources manager is not inherently "oppositional" in the same way as the victim's own report of that misconduct. The introduction of an intermediary at least has the potential to remove the oppositional element from the intermediary's report.

Plaintiff attempts to distinguish cases like Correa on the ground that they are limited to the peculiar position of human resources director – the person often responsible, depending on the organization, for receiving and processing discrimination or other complaints. It is true that the Court in Correa noted that "[a]dopting plaintiff's position would render practically all of her work activities and work product subject to Title VII protection." Correa, 550 F. Supp. 2d at 330. However, I believe that Correa and cases like it overstate the concern about excessively protecting human resources managers. Correa itself notes that the plaintiff there did many things as human resources manager besides handle discrimination complaints. See id. at 323 (listing "traditional human resource functions including: recruiting, hiring and terminating employees; employee benefits; employee orientation; updating the employee handbook; and ensuring that employees compl[y] with [company] policies and procedures."). Under the opposition clause of § 704, the question remains whether the employee who claims retaliation was simply doing his

10

job by forwarding complaints that came to his attention, or, rather, was challenging the institution to take corrective action because he believed it was necessary to do so. Depending on the facts, a human resources manager can act pursuant to either motivation to the same extent as any other manager.

For this reason, I reject plaintiff's contention that there is something "special" about human resources managers as compared to academic supervisors. Judges and lawyers may tend to see human resources managers as virtually exclusively involved in discrimination and harassment complaints, but that is because they most frequently appear in Court in that capacity. Indeed, outside of employing a human resources specialist to handle only discrimination and harassment complaints, any organization with a general human resources manager would hope that the amount of time that manager spent on such complaints would be as minimal a part of their job as possible in relation to other, production-oriented activities – e.g., hiring, firing, interviewing, vetting qualifications, or researching and recommending compensation. Similarly, if an academic chairperson is required as part of his job to report incidents of sexual harassment that come to his attention, as is the case here, the mere performance of that function is not "opposition" to his employer and does not constitute protected activity.

For this reason, it is defendants who overstate the protective value of the college's anti-harassment policy on the facts of this case. Although the obligation placed upon departmental chairs under the College's policy is broad, it cannot be the case that the adoption of an anti-harassment policy with mandatory reporting obligations immunizes the organization from claims of retaliation. If it did, every organization would have such a policy requiring all employees to report all acts of discrimination (and some do). The only workable test is to examine the motivation of the reporting employee and determine if he was being an advocate for the alleged

victim, or acting with the purpose of supporting his employer, i.e., being a "good corporate citizen" in making the report. That is going to be a question of fact unless the facts permit no reasonable conclusion other than that the employee was pursuing his organizational role.

Thus, in Johnson v. University of Cincinnati, 215 F.3d 561 (6th Cir. 2000), the plaintiff was hired as the Vice President of Human Resources and Human Relations at the defendant university. His specific task was to recruit more women and minorities. When he reported his dissatisfaction with progress in the area, he was terminated, and he sued for retaliation. The Sixth Circuit held that notwithstanding his position, he had opposed discriminatory practices, and thus had a viable Title VII retaliation claim: "[T]he fact that Plaintiff may have had a contractual duty to voice such concerns is of no consequence to his claim." Id. at 579.

In contrast, in Correa, the Court found as a matter of law that the plaintiff human resources director was simply doing her job by reporting several claims of discrimination. It based this determination on, among other things, undisputed evidence that the plaintiff in fact had evaluated and considered the discrimination claims and believed them to be not credible, just as did her superiors to whom she had reported those claims. See Correa, 550 F. Supp. 2d at 327-28 ("Plaintiff admits that she did not support or encourage any of the employees who filed administrative complaints. In fact, she did not believe that they have suffered discrimination and she was one of the people they complained had discriminated against them.") (citations omitted).

In the instant case, there seems no factual dispute that plaintiff believed that Egbe sexually harassed Maggio. In addition, there is, at the very least, a factual dispute over whether plaintiff took the actions allegedly leading to retaliation because he had become an advocate for Maggio, or whether he considered those actions to have been taken pursuant to his official duties and was therefore acting on behalf of MEC. In fact, of his actions that he claims led to

retaliation, none of them are strictly referable to the anti-harassment policy. Nothing in the policy expressly required him to confront Maggio's alleged harasser; nor to have multiple conversations with the Provost about it; nor to respond to questions from the police, the Attorney General's Office, or the CUNY Central Office.

The question is whether plaintiff was motivated by his support for Maggio, i.e., whether he was "taking on" a Dean of the College and thus the College itself on her behalf, or instead was performing the assigned responsibilities of his position. This inquiry is as applicable to plaintiff's actions in talking to the police and the Attorney General as it is to his "discussions" with the Provost. See Crawford, 129 S.Ct. at 851. The evidence in the record as to his motivation cuts both ways, and therefore presents a question of fact.

### III

Defendants next contend that the retaliatory actions to which plaintiff claims he was subjected were "petty slights and minor annoyances" as defined in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 126 S.Ct. 2405 (2006), and thus do not constitute material adverse actions to support a retaliation claim.

Burlington seems to me to have been a relatively easy case, where the alleged retaliatory actions – removal of prestigious job responsibilities with the substitution of arduous tasks, and suspension without pay for more than a month, to be cured only through grievance proceedings – are plainly materially adverse. The Second Circuit's reported decisions applying Burlington are similarly straightforward. See Patane v. Clark, 508 F.3d 106 (2d Cir. 2007) (upholding retaliation claim where plaintiff had her workload removed and defendant conspired to avoid giving her any work); Kessler, 461 F.3d at 199 (sustaining retaliation claim where mid-level manager was stripped of "broad discretionary and managerial functions . . . no one would report

13

to him, and he would be forced to do work normally performed by clerical and lower-level personnel"); compare Zelnik v. Fashion Institute of Technology, 464 F.2d 217 (2d Cir. 2006) (rejecting retaliation claim where denial of "emeritus" title was purely honorific).

However, Burlington and the cases sustaining retaliation claims seem relatively easy because the test laid down in Burlington is so broad. Particularly in the context of a party who starts out merely supporting a co-worker's sexual harassment claim and emerges with his own retaliation claim, as plaintiff alleges here, it seems to me that it does not take much to "dissuade a reasonable worker from . . . supporting a charge of discrimination," 548 U.S. at 57. Most people want to go to work, focus on their jobs, and take home their paychecks. Make it incrementally more difficult for a worker as a result of something the worker has done, and all but the most principled, courageous, or desperate are likely to refrain from supporting a colleague or subordinate in favor of keeping their own jobs and minimizing the risk of employer criticism or discipline.

Justice Alito, concurring in the Burlington judgment, recognized the anomaly created by the decision, whereby a worker subjected to severe discrimination will be hard pressed to state a claim for retaliation – because it would take quite a lot to get that worker to back off – but another worker who is subjected to minor discrimination will have a much easier time prevailing on a retaliation claim because someone in that worker's position would be much more easily "chilled." See Burlington, 548 U.S. at 78 ("Specifically, the majority's interpretation logically implies that the degree of protection afforded to a victim of retaliation is inversely proportional to the severity of the original act of discrimination that prompted the retaliation."). That concern is even more applicable to retaliation claims, unlike the one in Burlington, in which the plaintiff is not the victim of harassment, but has supported another worker who is.

14

Under Burlington's broad standard, I hold that plaintiff has shown, albeit barely, that the matters about which he is complaining could be material adverse actions. Defendants downplay the decision not to stock the textbook he authored in the college bookstore, because he could still use it in courses without multiple sections (i.e., where plaintiff was the only instructor for the course), but it is easy to see that economic harm could flow from this decision, even if it is hard to quantify, and economic harm is the clearest example of a material adverse action.

In addition, if plaintiff's characterization of his being "locked out" of his classroom is correct, combined with the establishment of "alternative" sections to his course, a jury could reasonably find that defendants deliberately marginalized him among the faculty and student body. That could be more than a "petty slight;" it could create a situation where students might not want to take his class. See Billings v. Town of Grafton, 515 F.3d 39, 54-55 (1st Cir. 2008) (although criticizing and becoming aloof to an employee were not material adverse actions, investigating her and barring her from an office to which she previously had access might be under Burlington). Indeed, as shown by the defection to the alternative sections that were created, the students all bolted away from plaintiff, although the parties dispute whether that was because he was a bad teacher or because the administration had suggested that he was. That is a much more serious allegation than in the cases upon which defendant relies, like Reico v. Creighton Univ., 521 F.3d 934, 940 (8th Cir. 2008), where the issue is simply the imposition of a less convenient teaching schedule. Although his inability to finish teaching the last two months of his courses, with no diminution in pay and full restoration of his class sizes the next and all

further semesters, is barely sufficient to avoid classification as "slight," it suffices for purposes of summary judgment.[4]

## IV

Plaintiff contends that post-Burlington, he need not demonstrate that the retaliation was so pervasive and severe that it altered the conditions of his working environment, as cases such as Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993), have required. Plaintiff argues that because Burlington changed the standard for retaliation claims from material adverse employment action to material adverse action, with the focus on whether a reasonable employee might be dissuaded from engaging in the protected activity, the standard for retaliatory hostile work environment claims has also necessarily been eased. See Khan v. HIP Centralized Laboratory Services, Inc., 03-cv-2411, 2007 WL 1011325 (E.D.N.Y. March 30, 2007) (noting, without deciding, that Burlington may require revision of the standard for retaliatory hostile work environment claims); but see Patane, 508 F.3d at 113-16 (2d Cir. 2007) (analyzing retaliation claim under Burlington while applying Harris standard for hostile work environment claim).

Absent further guidance from the Supreme Court or the Second Circuit, I am not prepared to read Burlington so expansively. The Supreme Court found it necessary to impose a broader standard for retaliation claims than the Second Circuit and some other Circuits had applied to accomplish the anti-retaliation purposes of §704, but there is no indication that the Supreme Court also felt it necessary to expand the reach of a claim for retaliatory hostile work environment claims, especially in light of the expanded definition of retaliatory act that the Supreme Court adopted. Moreover, Burlington arose from §704 itself, whereas a claim for

---

[4] It should be noted, however, that plaintiff's claim stemming from "the attempted transfer by President Jackson of Plaintiff to the Department of Social and Behavioral Sciences" in early 2005 is inadequate as this departmental restructuring never occurred.

retaliatory hostile work environment is a judge-made claim that is not even recognized in some circuits. See Bryan v. Chertoff, 217 Fed. Appx. 289, 2007 WL 216297, *3-4 (5th Cir. Jan. 29, 2007) (table). Given the well-established requirements for the construction of this claim in the Second Circuit, the claim should be determined under existing law.

Considering the barely adequate nature of plaintiff's alleged retaliatory acts, this claim cannot prevail. No reasonable jury could find that the handful of disconnected acts that he suffered were "severe or pervasive" enough that a reasonable person would find his environment hostile or abusive. See Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001). These are not "environmental" allegations. Plaintiff alleges discrete acts, undertaken by different individuals over considerable periods of time. They did not alter his work environment on a day-to-day basis, and no one or combination of them was so severe that it altered his working conditions. See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) ("incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").

V

To demonstrate a prima facie case of retaliation, plaintiff must come forward with facts showing "a causal connection between the protected activity and the adverse employment action." Gregory v. Daly, 243 F.3d 687, 700 (2d Cir.2001) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.1996)). In examining the record, I note at the outset plaintiff's acknowledgement that this is a "mixed motive" case, not in the usual sense that a defendant is alleged to have taken actions not only for both legitimate and illegitimate reasons, but because plaintiff alleges that at least as to Jackson, and through him, CUNY, defendants had two illegitimate motives – retaliation for plaintiff's support of Maggio, and/or for having exposed Udeogalanya's deficient credentials. However, as discussed below, I hold that plaintiff has

17

failed to demonstrate a prima facie case of First Amendment discrimination for other reasons. Thus, the only issue as to causation is whether a jury could reasonably find that that the actions plaintiff undertook with respect to Maggio were causally related to the retaliatory acts that he claims he suffered.

On that issue, there are quite sizeable time gaps between the actions plaintiff took and the harm he is alleged to have suffered. His support of Maggio occurred in late 2001 and early 2002. Putting aside the time-bar that I have previously found, he does not contend that any of the defendants took any action against him for more than two years. That is a long time to carry a grudge by someone bent on retaliation, longer than Title VII allows. See Miller v. Nortion, No. 04-CV-3223, 2008 WL 905830, at *8 (E.D.N.Y. Mar. 31, 2008) (finding that a gap of over a year was "outside of the time frame established by prior Second Circuit case law from which retaliatory intent can automatically be inferred."). To the extent that plaintiff is claiming that the acts taken against him in the Fall of 2006 were also related to his support of Maggio (comparing plaintiff's brief in opposition to defendant's motion with his complaint leaves it unclear as to which retaliatory acts are attributable to the Maggio or the Udeogalanya incident, or both), it is obviously an even longer period.

Faced with the length of the period between the protected conduct and the alleged retaliatory acts, plaintiff has come up with several other theories, some of these post-oral argument, to shorten the time between his action and defendants' alleged reaction. First, he points to the fact that it was not until early 2005 that he was interviewed by a CUNY investigator, and argues that the time period between that and the November, 2006 actions against him permit an inference of causation. I do not see how a reasonable jury could so

conclude. It would mean that defendants lay in wait for, again, nearly two years before retaliating against him for talking to the investigator.

Plaintiff also alleges that Jackson's refusal to recognize the DAEF's election of him as Chair, which Jackson had the right to do for good cause under CUNY by-laws, was in retaliation for his support of Maggio's claim. However, the timing does not make sense causally. Jackson's official letter expressing his decision not to allow plaintiff's election was sent on July 1, 2004. The record shows that the decision itself was clearly made and communicated earlier, as various members of the Department formally protested it by a resolution signed in May, 2004. Yet the record is also clear that Jackson did not learn of the Maggio incident, let alone plaintiff's support for Maggio, until the Fall of 2004, when it came to his attention that Maggio had made a complaint about Egbe to the police.

Plaintiff asserts that Jackson must be lying when he asserts that he did not know of the Maggio incident until the Fall of 2004. However, the record contains no evidence upon which a jury could find that Jackson knew of the Maggio/Egbe complaint prior to that time. It is not enough to simply accuse Jackson of dissembling, see Crawford-El v. Britton, 523 U.S. 574, 600, 118 S.Ct. 1584 (2007) ("[I]f the [moving party] has made a properly supported motion [for summary judgment], the plaintiff may not respond simply with general attacks upon the defendant's credibility . . ."), and plaintiff has pointed to no circumstances that could cause a reasonable jury to doubt his testimony. The only "evidence" that plaintiff points to is his understanding that Nwasike, who knew of the Maggio/Egbe issue back in 2001 or 2002, reports to Jackson – plaintiff testified that, "Oh, the president knew because the president talks to the provost all the time." That is not evidence. Plaintiff has made no attempt to develop on this record whether there was any basis for that conclusion, e.g., did Nwasike and Jackson have

19

regular exchanges and, if so, how frequently; were employment discrimination issues ever discussed between them; were there any formal meetings to discuss college issues. No emails or memoranda have been produced identifying this as an item of discussion until after Jackson asserts that he learned of Maggio's complaint. Plaintiff had a full opportunity for discovery and has produced no circumstantial evidence to challenge Jackson's assertion.

Finally, to the extent plaintiff is alleging that the actions taken against him in the Fall of 2006, including the lock-out from his classroom, also were in retaliation for his support of Maggio, it is too attenuated to support causation. Although Jackson, by the time of the lockout in November 2006, knew of the Maggio incident, it had been over two years since he learned of it, and four or five years since it had happened. The elongated time period would not support a reasonable jury's finding of causation.

## VI

To determine whether a public employee is protected under the First Amendment from retaliation for his speech requires the examination of three factors: (1) did the employee engage in constitutionally protected speech because he spoke as a citizen on a matter of public concern; (2) did the employee suffer an adverse employment action; and (3) was the speech a motivating factor in the adverse employment decision. Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006).

Defendants contend that plaintiff's First Amendment retaliation claims are barred under Garcetti v. Ceballos, 547 U.S. 410 (2006), because the actions he took concerning Maggio's complaints were within the scope of his job responsibilities, and thus he was not speaking as a public citizen, but as an employee. Garcetti held that an assistant district attorney's memorandum to his superior, in which he advocated dismissal of an indictment due to a

defective warrant, and for which he was disciplined, was part of his job and not protected speech under the First Amendment.

As can be seen from this synopsis of the argument, the issue is somewhat related to the Title VII requirement that plaintiff must oppose discrimination, rather than simply report it as part of his job, to have a retaliation claim. Both arguments require an assessment of a plaintiff's job responsibilities. There is, however, a significant difference.

The Title VII retaliation claim, because of the liberal construction given to the statute, see Anderson v. Yarp Restaurant, Inc., No. 94 CIV. 7543, 1996 WL 271891, at *3 (S.D.N.Y. May 21,1996), focuses on the plaintiff's reasonable belief that he was championing the cause of the employee who had suffered harassment as opposed to supporting his employer. It is thus a subjective test. In contrast, Garcetti makes it clear that the focus is on the objective assessment of the employee's job responsibilities, since one purpose of the rule laid down by the Supreme Court is to prevent undue interference in a public employer's ability to run its organization and discipline employees. It makes no difference if the employee is an advocate in opposition to an organizational decision or policy or speaks in support of it; indeed, the plaintiff in Garcetti was vehemently in opposition to an organizational decision, yet the Supreme Court ruled that he had no First Amendment retaliation claim for having expressed it, since the subject area upon which he expressed his views was part of his job. The question is the more objective one of whether what the plaintiff did was called for as part of his job responsibilities or was something outside of those responsibilities.

Applying this test, it does not matter that plaintiff professes not to have seen the written policy; or that he reported the alleged discrimination to a person other than the one designated in the policy; or that his advertised job description did not expressly include his responsibilities

under the anti-harassment policy. See Garcetti, 547 U.S. at 422 ("[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform . . ."). The record shows that he knew that there was such a policy (a "protocol," as he called it) and that it imposed obligations on him to report sexual harassment when it came to his attention. For First Amendment purposes, he could not escape his obligation as a manager by performing his job imperfectly (by reporting the harassment to the Provost instead of the Panel Coordinator), overzealously (as in Garcetti), or by failing to obtain full knowledge of the parameters of that obligation. See Barclay v. Michalsky, 493 F. Supp. 2d 269 (D. Conn. 2007) (where work rule required nurse to report conditions that might endanger patients, her ignorance of the existence of the specific procedures in the rule did not bring her actions outside of her work role for First Amendment purposes, where she knew she had a "general professional responsibility to complain").

Like his conversations with the Provost to report Maggio's claims of harassment, plaintiff's other actions – answering questions from the Attorney General, the police, and the CUNY Central Office – are wholly referable to the performance of his official functions. They therefore do not fall under the First Amendment and are not actionable. This is shown by Ruotolo v. City of New York, No. 03 Civ. 5045, 2006 WL 2033662 (S.D.N.Y. July 19, 2006), aff'd, 514 F.3d 184 (2d Cir. 2008), where the plaintiff police sergeant wrote a report pursuant to an assignment to examine environmental health risks to officers at a precinct house. He was then visited by a lawyer from the Police Benevolent Association, and answered questions concerning those health risks. The Court, after first rejecting his First Amendment claims concerning the report, similarly rejected his claims that his conversation with the PBA lawyer constituted protected speech under the First Amendment: "In speaking with the lawyers, [plaintiff]

discussed the product that he had produced pursuant to his duties as Command Safety Officer. He was thus satisfying the same duty he discharged in preparing the Report, that is, answering concerns by or on behalf of police officers about health issues at the 50th Precinct." Id. at *4.

Despite plaintiff's effort to characterize his job as purely academic or pedagogical, the record is clear that he had personnel management responsibilities as part of his job as Departmental Chair, and he knew it. Indeed, the only reason that Maggio approached him, according to plaintiff, was because she knew it was part of his job as Chair to receive such grievances, not because he had some pre-existing personal or professional relationship with her. He thus became embroiled in the dispute that gave rise to his claim for retaliation only because of his employment responsibilities. If, as he alleges, he was subjected to retaliation because of his actions concerning Maggio, he only had occasion to take those actions because of his job as Chair.

I recognize that just because plaintiff became involved in a matter because of his job does not preclude him from having First Amendment rights concerning that matter. See Garcetti, 547 U.S. at 423 ("Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government."). But none of the other circumstances surrounding his conduct suggest that he was doing anything other than his job. Plaintiff did not, for example, seek to reach out beyond the college to communicate concerns that he believed to be in the public interest (unlike Maggio, who, with her attorney, participated in a newspaper interview), but limited his communications to internal channels. Compare Pickering v. Board of Ed. Of Township High School Dist. 205, Will Cty., 391 U.S. 563, 88 S.Ct. 1731 (1968) (teacher's letter to newspaper concerning school budgeting protected by First

Amendment).  Although Garcetti makes clear that this factor is not determinative, there is

nothing to show that plaintiff's communications, whether with the Provost or other authorities,

were outside the scope of his responsibilities as Chair of the Department.

It should also be noted that Garcetti's concern about judicial involvement in the

personnel decisions of public institutions through First Amendment claims is very much

implicated here.  Although of course I will not take sides on a motion for summary judgment, I

think both sides would agree that there was open academic warfare between the original

Department of Accounting, Economics and Finance and the Administration either stemming

from or reflecting the Department's vehement preference for plaintiff as Chair in 2004 and the

Administration's equally vehemently expressed views that he was not qualified and its

preference for Egbe to serve as Chair.  Just based on the minutes of the meeting on August 23,

2004 that the Administration attended, there can be no question that this dispute had the

"potential to affect the entity's operations," Garcetti, 547 U.S. at 418, a factor which militates

against the viability of a First Amendment claim.  Compare Pickering, 391 U.S. at 574 (teacher's

letter to newspaper did not affect operational aspects at school).  As the Supreme Court noted in

Connick v. Myers, 461 U.S. 138, 143,103 S.Ct. 1684 (1983), "[g]overnment offices could not

function if every employment decision became a constitutional matter."

Finally, I reject plaintiff's argument that because Garcetti left open the possibility of

broader First Amendment protection for employees of public educational institutions than

employees of other governmental agencies, plaintiff's First Amendment claim survives here. The

Court reserved decision on whether a broader level of protection might be necessary in matters

concerning "academic scholarship or classroom instruction." 547 U.S. at 425.  Picking up on

Justice Souter's dissent, the majority was concerned about the possibility that public educational

24

institutions, with their special role in developing and communicating new and sometimes unpopular ideas, could seek to employ <u>Garcetti</u>'s deference to the need to avoid judicial intrusion into public personnel decisions as a means to squelch ideas that are at the heart of the First Amendment. <u>See id.</u> at 438-39 (Souter, J., dissenting). However, the instant case has nothing to do with academic freedom or a challenged suppression of unpopular ideas. It is, instead, an ordinary retaliation case arising out of a claim of sexual harassment. The speech at issue here could have occurred just as easily in a private office, or on a loading dock. There is nothing more elevated or important under the First Amendment about the discourse at issue here than there was in <u>Garcetti</u>.

VII

Plaintiff's investigation and exposure of Prof. Udeogalanya's credentials does not address a matter of public concern and thus the alleged retaliation is not actionable. Plaintiff had a direct personal interest in the outcome of the matter, as he stood a good chance of becoming Chair of the Department of Economics and Finance if she was disqualified. This was a routine academic skirmish over whether Udeogalanya's doctorate was from a properly accredited university. The lack of accreditation would not preclude her from being a member of the faculty; the fact that a technical requirement of the CUNY policy required it for her to be a departmental chair does not make it a matter of concern to anyone other than some faculty members. <u>See Shub v. Westchester Community College</u>, 556 F. Supp. 2d 227, 245 (S.D.N.Y. 2008) (plaintiff failed to "provide evidence that the inequitable treatment of faculty had any impact beyond the faculty members involved"); <u>Harris v. Merwin</u>, 901 F. Supp. 509 (N.D.N.Y. 1995). If there was some local or national discourse concerning the appointment of departmental heads at city colleges or colleges generally who were lacking in certain kinds of academic credentials, perhaps plaintiff

would have a claim. Plaintiff has put nothing in the record to suggest there was any interest in this topic outside of the relatively few people involved in this case.

VIII

Plaintiff's state and local law claims against the individual defendants fail to raise an issue of fact. The claims against Jackson, Williams, Fonseca, and Udeogalanya, based upon plaintiff's exposure of Udeogalanya's lack of credentials, fail because plaintiff's speech did not involve a matter of public interest. There is no evidence that Jackson had any involvement with regard to plaintiff's teaching schedule and plaintiff's textbook.

CONCLUSION

Defendants' motion for summary judgment is granted. The Clerk of the Court is directed to enter final judgment.

**SO ORDERED.**

/s/(BMC)

_____

U.S.D.J.

Dated: Brooklyn, New York
       March 27, 2009